# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | |
|---|---|
| HUMAN RIGHTS DEFENSE CENTER, | |
| Plaintiff, | |
| v. | Civil Action No. _____ |
| SOUTHWEST VIRGINIA REGIONAL JAIL AUTHORITY; STEPHEN CLEAR, Superintendent, in his individual and official capacities; and DOES 1-10, in their individual and official capacities, | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

## PRELIMINARY STATEMENT

1.      Plaintiff, Human Rights Defense Center ("HRDC" or "Plaintiff"), brings this action to enjoin the Southwest Virginia Regional Jail Authority (the "Jail Authority") and its employees from unconstitutionally censoring HRDC's correspondence to incarcerated persons, and for damages arising from such censorship.

2.      HRDC, a not-for-profit charitable organization, sends books, magazines, and other correspondence to persons incarcerated in facilities operated by the Jail Authority. These materials educate incarcerated persons about their legal and civil rights and their options for accessing education while incarcerated.  In communicating with such persons, HRDC engages in core protected speech and expressive conduct on matters of public concern, which are entitled to the highest protection afforded by the First Amendment of the U.S. Constitution.

3.      Yet since September 2016, and on an ongoing basis, the Jail Authority and employees of its four facilities in Southwest Virginia have refused to deliver hundreds of HRDC's mailings to incarcerated persons, directly violating HRDC's First Amendment right to free speech and communication.  The Jail Authority either has not notified HRDC when it censored these

mailings, or simply returned the mailings to HRDC with cryptic markings, such as "NO BOOKS," "NOT ALLOWED," "UNAUTHORIZED CORRESPONDENCE," or "REFUSED"—violating HRDC's Fourteenth Amendment rights to notice and an opportunity to challenge censorship.

4. Although the Jail Authority asserts that it has an official mail policy in place, its correctional officers arbitrarily enforce any such policy. As a result, incarcerated persons routinely do not receive mail sent to them, including mail from HRDC, and only sometimes receive "confiscation forms" in connection with this censorship. When incarcerated persons file grievances in connection with their undelivered mail, their grievances often go unanswered.

5. Incarcerated persons may spend years in the Jail Authority's facilities; however, they have extremely limited access to information from the outside world to make productive use of their period of incarceration and successfully prepare for re-entry to the public. Aside from occasional access to a "book cart" that contains a small number of aging books in poor condition, many persons incarcerated in the Jail Authority's facilities only have access to a single copy of a local daily newspaper to share among a "pod" (which can contain a group of approximately 16 to 24 people) and an electronic kiosk containing very limited legal information.

6. Because of their highly confined access to information inside the Jail Authority's facilities, incarcerated persons rely on receiving mailings and books from organizations like HRDC to educate themselves and prepare for re-entry. When the Jail Authority prohibits incarcerated persons from receiving outside mail and books, these persons are left in the dark—deprived of the ability to expand their minds through knowledge and education. Curtailing this basic human yearning serves no legitimate penological interest; it only exacerbates the public safety problems associated with inadequately preparing persons for re-entry into society.

2

7.     Accordingly, to ameliorate the injuries that the Jail Authority (and together with Superintendent Stephen Clear and Does 1–10, "Defendants") have inflicted on HRDC and its advocacy efforts, HRDC seeks damages for Defendants' violations and injunctive relief to ensure that Defendants cease their ongoing attacks on HRDC's constitutional rights.

## JURISDICTION AND VENUE

8.     This action is brought pursuant to 28 U.S.C. § 1331, as it arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343, as it seeks redress for civil rights violations under 42 U.S.C. § 1983.

9.     Venue is proper under 28 U.S.C. § 1391(b).  On information and belief, at least one Defendant resides within this judicial district, and the events giving rise to the claims asserted herein occurred within this judicial district.

10.     Plaintiff's claims for relief are predicated upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured to Plaintiff by the First and Fourteenth Amendments of the U.S. Constitution and the laws of the United States.

11.     This Court has jurisdiction over claims seeking declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure, as well as claims seeking nominal and compensatory damages, against all Defendants.

12.     Plaintiff's request for attorneys' fees and costs is predicated upon 42 U.S.C. § 1988, which authorizes the award of attorneys' fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. § 1983.

13.     Upon information and belief, Defendants acted with the intent to injure, vex, annoy, and harass Plaintiff, and subjected Plaintiff to cruel and unjust hardship in conscious disregard of

3

Plaintiff's rights with the intention of causing Plaintiff injury and depriving it of its constitutional rights. Therefore, Plaintiff seeks compensatory and punitive damages against the individual Defendants—including Superintendent Stephen Clear and Does 1–10 (together, "the Individual Defendants").

## PARTIES

14.     HRDC is a not-for-profit charitable organization recognized under § 501(c)(3) of the Internal Revenue Code, incorporated in the state of Washington and with principal offices in Lake Worth, Florida. For more than 27 years, HRDC has focused its mission on public education, advocacy, and outreach on behalf of, and for the purpose of assisting, incarcerated persons who seek legal redress for infringements of their constitutionally guaranteed and other basic human rights. HRDC's mission, if realized, has a salutary effect on public safety. HRDC publishes books and magazines through its wholly-owned project and publishing arm, Prison Legal News ("PLN"). HRDC, through PLN, engages in core protected speech and expressive conduct on matters of public concern, such as the operation of prison facilities, prison conditions, and the health, safety, and rights of incarcerated people. HRDC's publications contain political speech and social commentary, which are core First Amendment rights and are entitled to the highest protection afforded by the U.S. Constitution.

15.     The Jail Authority is a unit of government organized and existing under the laws of the Commonwealth of Virginia. The Jail Authority operates four (4) detention facilities in Virginia, in the cities of Abingdon, Duffield, Haysi, and Tazewell, which collectively detain nearly 2,000 incarcerated persons (individually, the "Abingdon Facility," the "Duffield Facility," the "Haysi Facility," and the "Tazewell Facility;" and together, the "Jail Authority's facilities"). The

4

Jail Authority is responsible for adopting and implementing mail policies governing incoming mail for incarcerated persons at all four facilities.

16.     Defendant Stephen Clear ("Clear") is the Superintendent of the Jail Authority. Clear is employed by and is an agent of the Jail Authority. He is responsible for overseeing the management and operations of the jail facilities, and for the hiring, screening, training, retention, supervision, discipline, counseling, and control of the personnel of the Jail Authority's facilities who interpret and apply the mail policy to incarcerated persons. As Superintendent, Clear is a final policymaker for the Jail Authority with respect to the operations of all of the Jail Authority's facilities, including for policies governing incoming mail for incarcerated persons. He is sued in his individual and official capacities.

17.     The true names and identities of Defendants DOES 1 through 10 are presently unknown to HRDC. Each of DOES 1 through 10 are or were employed by and are or were agents of the Jail Authority when some or all of the challenged mail policies and practices at the Jail Authority's facilities were adopted and/or implemented. Each of DOES 1 through 10 are or were personally involved in the adoption and/or implementation of the Jail Authority's mail policies for incarcerated persons, and/or are or were responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and/or control of the Jail Authority's staff who interpret and implement these mail policies. DOES 1 through 10 are sued in their individual and official capacities. HRDC will seek to amend this Complaint when the true names and identities of DOES 1 through 10 have been ascertained.

18.     At all times material to this Complaint, the actions of all Defendants as alleged herein were taken under the authority and color of state law.

## FACTUAL ALLEGATIONS

### I.     HRDC's Publications

19.     HRDC, through its publication project, PLN, publishes and distributes a soft-cover monthly magazine titled *Prison Legal News: Dedicated to Protecting Human Rights* ("*Prison Legal News*"), which contains news and analysis about prisons, jails, and other detention facilities, incarcerated persons' rights, court opinions, management of prison facilities, prison conditions, and other matters pertaining to the rights and/or interests of incarcerated individuals.  Each issue of the monthly magazine is published on newsprint and is 72 pages long.  HRDC has thousands of subscribers to its monthly magazine in the United States and abroad, including incarcerated persons, attorneys, judges, journalists, libraries, and members of the public.  HRDC distributes *Prison Legal News* to incarcerated persons in approximately 2,600 correctional facilities across the United States, including death row units and institutions within the Federal Bureau of Prisons, such as the federal Administrative Maximum Facility ("ADX" or "Supermax") in Florence, Colorado—the most secure prison in the United States.  *Prison Legal News* is distributed to prisons and jails within the correctional systems of all 50 states, including to hundreds of incarcerated persons housed in facilities in the Commonwealth of Virginia.

20.     Through PLN, HRDC also publishes and/or distributes approximately fifty different softcover books on subjects of interest to incarcerated persons and others who are interested in the criminal justice system.  These books are designed to foster a better understanding of criminal justice policies and to allow incarcerated persons to educate themselves about the law and issues related to their imprisonment and/or their pending cases, such as legal research, health care issues, and similar topics.  Pertinent to this case, HRDC publishes and distributes the *Prisoners' Guerrilla Handbook to Correspondence Programs in the United States and Canada*

6

("*Prisoners' Handbook*"), which provides incarcerated persons with information on enrolling at accredited higher educational, vocational, and training schools.

21.     In addition to monthly journal issues and books, HRDC also sends incarcerated persons: (a) informational brochure packets—containing a brochure and subscription order form, a book list, and a published books brochure (each of which is a single page); (b) an annual report/fundraising newsletter, which is printed and delivered in the same manner as *Prison Legal News*; (c) copies of judicial opinions of importance to incarcerated persons; and (d) legal letters in individually-addressed envelopes.

22.     HRDC has been trying to send these important materials to persons incarcerated at the Jail Authority's facilities.  Yet Defendants maintain mail and book policies or practices that unconstitutionally prevent HRDC from sending these materials to individuals incarcerated at the Jail Authority's facilities.

## II.     Defendants' Mail and Book Policies and Practices

23.     According to statements made by Defendants in court documents publicly filed on April 26, 2017, the Jail Authority implemented a policy effective March 1, 2015 to no longer accept personal material mailed to incarcerated persons from outside publishers.  Defendant Clear asserted that the policy was implemented due to "inappropriate material and lack of space in the property room," as well as "safety concerns," such as preventing fire hazards.  *See* Ex. A, Affidavit of Superintendent Stephen Clear in *Hardoby v. Southwest Virginia Regional Jail Authority*, No. 7:16-cv-00103 (W.D. Va. 2016) ("Clear Affidavit") ¶¶ 10–12.  Defendant Clear stated that the Jail Authority amended its official mail policy on June 1, 2016, to allow incarcerated persons to order books from a publishing company on a case-by-case basis, upon approval from the Jail Administrator or designee.  *See id.* ¶ 12.

7

24. Defendant Clear also asserted that the Jail Authority accepts, upon approval, donations to its library. *See id.* ¶ 13.

25. In reality, the experience of incarcerated persons at the Jail Authority's facilities does not align with Defendants' stated policies. Incarcerated persons at the Jail Authority's facilities are not aware of any official—or consistent—mail policy or practice. They have never heard of the June 1, 2016 policy that Defendants purport allows them to order books through the mail upon approval. Instead, the mail policy at the Jail Authority's facilities is arbitrary, and depends on which correctional officer is on duty on any given day.

26. Many incarcerated persons in the Jail Authority's facilities have experienced not receiving mail that they know was sent to them. These individuals only found out that they had not received mail from family members who told them about mailings that were never received.

27. Sometimes incarcerated persons receive confiscation forms from the Jail Authority's facilities when their mail is taken; other times, they do not. The confiscation forms offer the incarcerated person the difficult choice of—(1) allowing their mail to be destroyed; or (2) returning the mail to the sender at the incarcerated person's own expense.

28. When incarcerated persons file grievances with the Jail Authority's facilities when their mail—including mail from HRDC—is confiscated, they often either do not receive a response, or receive unhelpful answers.

29. There is no legitimate penological interest justifying Defendants' policy or practice of censoring reading materials sent through the mail. Many individuals incarcerated at the Jail Authority's facilities have not observed security or safety issues, including fire hazards, associated with receiving reading materials. Nor is there any reasonable concern about space

overcrowding, as the Jail Authority's facilities contain ample space for reading materials in the cells and common areas.

30.     Without the ability to send its publications to incarcerated persons at the Jail Authority's facilities via mail, HRDC has no alternative means of exercising its right to communicate with these persons.  Further, persons incarcerated in the Jail Authority's facilities have no alternative means of acquiring the type of information that HRDC is attempting to communicate—information regarding their legal and civil rights and access to education while incarcerated.

31.     To the contrary, incarcerated persons' options for receiving books and other reading material inside the Jail Authority's facilities are meager.  None of the Jail Authority's facilities allow physical access to libraries.  While the Jail Authority claims it has a book-donation policy, any such policy has been discontinued.

32.     Instead, at the Haysi and Tazewell Facilities, the correctional officers send around "book carts" sporadically, perhaps once or twice a month.  The book cart at the Haysi Facility contains 30-40 aging books in poor condition—primarily romance novels that are missing pages and even whole chapters—and the Facility does not refresh the cart with new books.  Incarcerated persons are only allowed to possess two books from the book cart at any given time.

33.     Instead of providing book carts, the Abingdon and Duffield Facilities provide incarcerated persons with library slips for requesting books.  However, the incarcerated persons do not always receive the books they request.

34.     Aside from sporadic book carts or library slips, many incarcerated persons only have access to a single copy of a local newspaper to share among a "pod" of approximately 16-24 people, and an electronic kiosk containing limited legal information.  These incarcerated persons

9

are not guaranteed access to the kiosk on any given day, and are only permitted to use the kiosk for 15 to 30 minutes at a time. Further, many of the persons incarcerated at the Jail Authority's facilities are not allowed access to a television or radio.

35.    Because of these policies and practices at the Jail Authority, incarcerated persons in the Jail Authority's facilities have no alternative ways to obtain information about their legal and civil rights, other than to receive such information by mail from organizations such as HRDC. The ability to send such information is therefore critically important to HRDC, which aims to advance incarcerated persons' education and understanding of their legal rights, particularly in criminal cases and applications for post-conviction relief.

## III.    Defendants' Censorship of HRDC's Mail

36.    In addition to reports from incarcerated persons at the Jail Authority's facilities, HRDC has further evidence of Defendants' censorship of HRDC's mailings to incarcerated persons at the Jail Authority's facilities because many of those mailings have been returned to HRDC.

37.    Defendants have censored the following materials sent by HRDC to incarcerated persons held by the Jail Authority: (1) issues of the monthly magazine, *Prison Legal News*; (2) sample issues of *Prison Legal News*; (3) the *Prisoners' Handbook*; (4) the annual report/fundraising newsletter; (5) legal letters; (6) informational brochure packets; and (7) court opinions. Defendants refused to deliver said items to the incarcerated persons and, in some instances, returned items to Plaintiff's office via the "Return to Sender" service of the United States Postal Service. Defendants continue to censor many of the items listed above.

38.    Altogether, since September 2016, Plaintiff can identify at least two hundred twenty-two (222) pieces of mail sent by HRDC to persons incarcerated at the Jail Authority's

facilities, which Defendants refused to deliver to HRDC's intended recipients. This mail includes one hundred thirty-two (132) issues of *Prison Legal News*, fourteen (14) sample issues of *Prison Legal News*, forty-four (44) copies of the *Prisoners' Handbook*, ten (10) annual reports, eight (8) legal letters, seven (7) informational packets, and seven (7) court opinions.

39. Such restrictions on written speech sent to persons incarcerated at the Jail Authority's facilities are not rationally related to any legitimate penological interest and violate HRDC's First Amendment right to communicate speech to incarcerated persons.

40. On information and belief, a substantial portion of the hundreds of magazines, books, and other communications mailed by HRDC to persons incarcerated in the Jail Authority's facilities were also censored by Defendants.

41. Defendants' policies, practices, and customs are unconstitutional, both facially and as applied to HRDC.

42. Further, Defendants' censorship policies, practices, and customs have a chilling effect on HRDC's future speech and expression directed toward persons incarcerated at the Jail Authority's facilities.

43. Plaintiff will continue to mail copies of its books and other publications to subscribers, customers, and other individuals imprisoned in the Jail Authority's facilities, despite Defendants' unconstitutional censorship. Plaintiff seeks the protection of this Court to ensure that Defendants cease their unlawful misconduct, and either deliver HRDC's written speech or satisfy due process by providing HRDC with the basis for any censorship so that HRDC may challenge the censorship.

### a. **Censorship at the Abingdon Facility**

44.     Since September 2016, HRDC can identify at least twenty-nine (29) separate occasions in which Defendants censored individually addressed issues of *Prison Legal News* magazines, books, and other communications addressed to individual incarcerated persons at the Abingdon Facility.  Defendants failed to deliver the foregoing items to the incarcerated persons named by HRDC as recipients.  Instead, Defendants returned the mail at HRDC's expense, with various markings, such as the following:

        (1) "RETURN TO SENDER";

        (2) "REFUSED";

        (3) "NOT ALLOWED";

        (4) "RTS"

45.     On information and belief, Defendants also censored other magazines, books, and communications that HRDC mailed to persons incarcerated by the Jail Authority at the Abingdon Facility.

46.     Defendants' policies, practices, and customs are unconstitutional both facially and as applied to HRDC.

47.     Defendants' censorship policies, practices, and customs have a chilling effect on HRDC's future speech and expression directed toward persons incarcerated in the Jail Authority's Abingdon Facility.

48.     HRDC will continue to mail copies of its publications to subscribers, customers, and other individuals imprisoned at the Abingdon Facility, as well as enveloped correspondence containing informational brochure packets, court opinions, and legal correspondence.

**b. <u>Censorship at the Duffield Facility</u>**

49.     Since September 2016, HRDC can identify at least one hundred five (105) separate occasions in which Defendants censored individually addressed issues of *Prison Legal News* magazines, books, and other communications addressed to individual incarcerated persons at the Duffield Facility.  Defendants failed to deliver the foregoing items to the incarcerated persons named by HRDC as recipients.  Instead, Defendants returned the mail at HRDC's expense, with various markings, such as the following:

>       (1) "REFUSED";

>       (2) "RETURN TO SENDER";

>       (3) "NO BOOKS"

50.     On information and belief, Defendants also censored other magazines, books, and communications that HRDC mailed to persons incarcerated by the Jail Authority at the Duffield Facility.

51.     Defendants' policies, practices, and customs are unconstitutional both facially and as applied to HRDC.

52.     Defendants' censorship policies, practices, and customs have a chilling effect on HRDC's future speech and expression directed toward persons incarcerated in the Jail Authority's Duffield Facility.

53.     HRDC will continue to mail copies of its publications to subscribers, customers, and other individuals imprisoned at the Duffield Facility, as well as enveloped correspondence containing informational brochure packets, court opinions, and legal correspondence.

**c. <u>Censorship at the Haysi Facility</u>**

54.     Since September 2016, HRDC can identify at least seventy-six (76) separate occasions in which Defendants censored individually addressed issues of *Prison Legal News*

13

magazines, books, and other communications addressed to individual incarcerated persons at the Haysi Facility. Defendants failed to deliver the foregoing items to the incarcerated persons named by HRDC as recipients. Instead, Defendants returned the mail at HRDC's expense, with various markings, such as the following:

(1) "REFUSED";

(2) "REF";

(3) "NOT ALLOWED";

(4) "RETURN TO SENDER UNAUTHORIZED CORRESPONDENCE";

(5) "UNABLE TO HAVE @ FACILITY"

55.    On information and belief, Defendants also censored other magazines, books, and communications that HRDC mailed to persons incarcerated by the Jail Authority at the Haysi Facility.

56.    Defendants' policies, practices, and customs are unconstitutional both facially and as applied to HRDC.

57.    Defendants' censorship policies, practices, and customs have a chilling effect on HRDC's future speech and expression directed toward incarcerated persons at the Jail Authority's Haysi Facility.

58.    HRDC will continue to mail copies of its publications to subscribers, customers, and other individuals imprisoned at the Haysi Facility, as well as enveloped correspondence containing informational brochure packets, court opinions, and legal correspondence.

### d. Censorship at the Tazewell Facility

59.    Since September 2016, HRDC can identify at least twelve (12) separate occasions in which Defendants censored individually addressed issues of *Prison Legal News* magazines, books, and other communications addressed to individual incarcerated persons at the Tazewell

Facility. Defendants failed to deliver the foregoing items to the incarcerated persons named by HRDC as recipients. Further, hardly any items were returned to HRDC from the Tazewell Facility.

60. On information and belief, Defendants censored the majority of, if not all, other monthly magazine issues, books, and communications that HRDC mailed to persons incarcerated by the Jail Authority at the Tazewell Facility.

61. Defendants' policies, practices, and customs are unconstitutional both facially and as applied to HRDC.

62. Defendants' censorship policies, practices, and customs have a chilling effect on HRDC's future speech and expression directed toward incarcerated persons at the Jail Authority's Tazewell facility.

63. Plaintiff will continue to mail copies of its publications to subscribers, customers, and other individuals imprisoned at the Jail Authority's Tazewell facility, as well as enveloped correspondence containing informational brochure packets, court opinions, and legal correspondence.

## IV.    Defendants' Failure to Provide Due Process Notice and an Opportunity to Appeal

64. On only two occasions did Defendants provide HRDC any notice that its communications were being censored. On December 19, 2016, HRDC received Confiscation Forms from the Jail Authority's Haysi Facility regarding the "PUBLICATION BOOK/MAGAZINE 'PRISON LEGAL NEWS'" sent to incarcerated persons Dallas Crihfield and Trevor Cole. The notices did not specify which publication was being censored.

65. Additionally, on January 23, 2017, HRDC received Confiscation Forms from the Jail Authority's Haysi Facility regarding the "MAGAZINE/PUBLICATION" sent to incarcerated

15

persons Dennis Vandyke, Matthew Harrington, Melissa Milam, Whitney Grubb, and Park Stanley. Again, the notices did not specify which publication was being censored.

66.     On both occasions, all of the Confiscation Forms cryptically stated the "REASON FOR CONFISCATION/SEIZURE" as "NOT ALLOWED."  None of the notices gave any more detail as to why the items were being censored, preventing HRDC from meaningfully addressing the censorship in any appeal.

67.     Nevertheless, on January 26, 2017, HRDC sent a letter via certified mail to the Jail Authority's Haysi Facility, appealing the rejection of HRDC's mail and urging Defendants to reverse their censorship decision.

68.     As of the date of filing this Complaint, HRDC has not received a response to that letter.

69.     In all other instances of Defendants' censorship of HRDC's speech, Defendants violated HRDC's due process rights under the Fourteenth Amendment by failing to provide any notice to HRDC explaining that its materials were rejected or the reason for rejecting them, and by failing to provide any opportunity for HRDC to challenge the censorship of its mail.

70.     Defendants also failed to explain the penological justification for any of their censorship decisions, failed to identify any specific mail policy upon which they relied in making those decisions, and otherwise failed to give any meaningful notice of their censorship.

V.     **Defendants' Unconstitutional Mail Policies and Practices Are Causing HRDC Ongoing and Irreparable Harm.**

71.      Due to Defendants' actions described above, HRDC has suffered damages, and will continue to suffer damages, including but not limited to: deprivation of its constitutional rights; frustration of its abilities to disseminate its political message, to recruit new subscribers and supporters, and to advance its mission as a not-for-profit organization; significant diversion of its

16

resources, including staff time; loss of potential subscribers and customers; damage to its reputation; and significant printing, handling, and mailing costs.

72.     Defendants' actions and omissions were and are motivated by malicious intent, and were and are all committed under color of law and with reckless indifference to HRDC's rights.

73.     Defendants and their agents are responsible for—or personally participated in— creating and implementing these unconstitutional policies, practices, and customs, and/or ratifying or adopting them.  Further, Defendants are responsible for training and supervising employees whose conduct has injured and continues to injure HRDC.

74.     Defendants' unconstitutional policies, practices, and customs are ongoing, and continue to violate HRDC's constitutional rights—causing irreparable harm.  Defendants' unconstitutional policies, practices, and customs will continue unless enjoined.  As such, HRDC has no adequate remedy at law.

75.     In addition to damages, HRDC is entitled to injunctive relief prohibiting Defendants from unconstitutionally censoring and refusing to deliver HRDC's mailings and depriving HRDC of due process of law.

**CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**
**Violation of the First Amendment Right to Free Speech and Communication**
**Under 42 U.S.C. § 1983**
**(Brought Against All Defendants)**

76.     HRDC repeats and re-alleges each and every allegation set forth above, and incorporates them herein by reference.

77.     The acts described above constitute violations of HRDC's rights, the rights of other correspondents who have attempted to or intend to correspond with persons incarcerated in

17

the Jail Authority's facilities, and the rights of persons incarcerated in the Jail Authority's facilities, under the First Amendment of the U.S. Constitution.

78.     HRDC has a constitutionally protected liberty interest in communicating with incarcerated individuals by sending books, information packets, legal letters, court opinions, and magazines to them via U.S. Mail.  Defendants' unconstitutional censorship violates HRDC's clearly established right to communicate with these individuals.

79.     There is no legitimate penological interest justifying Defendants' unconstitutional censorship; and HRDC has no alternative means of exercising its constitutional right to communicate with individuals incarcerated in the Jail Authority's facilities.  Further, the fact that thousands of correctional facilities in the United States allow HRDC and other publishers to send reading materials to incarcerated persons demonstrates that allowing these materials would not unduly burden Defendants; and Defendants' censorship is an exaggerated response to prison concerns.

80.     Defendants' conduct is objectively unreasonable and was undertaken recklessly, intentionally, willfully, with malice, and with deliberate indifference to the rights of others.

81.     HRDC's injuries and the violations of its constitutional rights were directly and proximately caused by Defendants' policies and practices; and those policies and practices were the moving force behind the violations.

82.     The acts described above have caused HRDC to suffer damages, and if not enjoined, will continue to cause HRDC to suffer damages.

83.     HRDC seeks declaratory and injunctive relief, and nominal and compensatory damages against all Defendants.  HRDC seeks punitive damages against the Individual Defendants in their individual capacities.

## SECOND CLAIM FOR RELIEF
### Violation of the Fourteenth Amendment Right to Notice and Due Process
### Under 42 U.S.C. § 1983
### (Brought Against All Defendants)

84.     HRDC repeats and re-alleges each and every allegation set forth above, and incorporates them herein by reference.

85.     The acts described above constitute violations of HRDC's rights, the rights of other correspondents who have attempted to or intend to correspond with persons incarcerated in the Jail Authority's facilities, and the rights of persons incarcerated in the Jail Authority's facilities, under the Fourteenth Amendment of the U.S. Constitution.

86.     HRDC has a clearly established right under the Due Process Clause of the Fourteenth Amendment to receive notice and an opportunity to object and/or appeal Defendants' decisions to prevent Plaintiff's mail from reaching incarcerated persons held by the Jail Authority.

87.     Defendants' policy and practice of censoring HRDC's books, information packets, legal letters, court opinions, and magazines fails to provide Plaintiff with individualized notice of the censorship or an opportunity to be heard.  Thus, Defendants are violating HRDC's clearly established right to due process.

88.     Defendants' conduct is objectively unreasonable and was undertaken recklessly, intentionally, willfully, with malice, and with deliberate indifference to the rights of others.

89.     HRDC's injuries and the violations of its constitutional rights were directly and proximately caused by Defendants' policies and practices; and those policies and practices were the moving force behind the violations.

90.     The acts described above have caused HRDC to suffer damages, and if not enjoined, will continue to cause HRDC to suffer damages.

19

91.     HRDC seeks declaratory and injunctive relief, and nominal and compensatory damages against all Defendants.  HRDC seeks punitive damages against the Individual Defendants in their individual capacities.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief as follows:

1.     A declaration that Defendants' policies and practices violate the First and Fourteenth Amendments of the U.S. Constitution;

2.     A preliminary and permanent injunction preventing Defendants from continuing to violate the First and Fourteenth Amendments of the U.S. Constitution, and providing other equitable relief;

3.     Nominal damages for each violation of HRDC's rights by Defendants;

4.     Compensatory damages against Defendants in an amount to be proved at trial;

5.     Punitive damages against the Individual Defendants in their individual capacities, in an amount to be proved at trial;

6.     An award of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and other applicable law; and

7.     Such further and additional relief as this Court may deem just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues properly tried to a jury.

Dated: March 28, 2018

Respectfully submitted,


s/ Sean M. Douglass

WILLIAMS & CONNOLLY LLP
Thomas G. Hentoff*
Sean M. Douglass (Va. Bar No. 83835)
Chelsea T. Kelly*
725 Twelfth Street NW
Washington, DC 20005
Telephone: (202) 434-5000
Fax: (202) 434-5029
thentoff@wc.com
sdouglass@wc.com
ckelly@wc.com

DAVIS WRIGHT TREMAINE LLP
Bruce E. H. Johnson*
Suite 2200
1201 Third Avenue
Seattle, Washington 98101-3045
Telephone: (206) 757-8069
brucejohnson@dwt.com

HUMAN RIGHTS DEFENSE CENTER
Sabarish Neelakanta*
Daniel Marshall*
Masimba Mutamba*
P.O. Box 1151
Lake Worth, FL 33460
Telephone: (561) 360-2523
sneelakanta@hrdc-law.org
dmarshall@hrdc-law.org
mmutamba@hrdc-law.org

*Attorneys for Plaintiff Human Rights Defense Center*


  *Pro hac vice* applications to be filed.

21