# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **HUMAN RIGHTS DEFENSE CENTER,** | ) ) ) |
| Plaintiff, | ) Case No. 1:18CV00013 ) ) |
| v. | ) **OPINION AND ORDER** ) |
| **SOUTHWEST VIRGINIA REGIONAL JAIL AUTHORITY, ET AL.,** | ) By: James P. Jones ) United States District Judge ) ) |
| Defendants. | ) |

*Thomas G. Hentoff, Sean M. Douglass, and Chelsea T. Kelly, Williams & Connolly LLP, Washington, D.C., Bruce E. H. Johnson, Davis Wright Tremaine LLP, Seattle, Washington, and Sabarish Neelakanta, Masimba Mutamba, and Daniel Marshall, Human Rights Defense Center, Lake Worth, Florida, for Plaintiff; Katherine C. Londos and Nathan H. Schnetzler, Frith Anderson + Peake, P.C., Roanoke, Virginia, for Defendants.*

The plaintiff in this civil action, a nonprofit organization, seeks a preliminary injunction prohibiting the defendants, a regional jail authority and its superintendent, from confiscating publications that the plaintiff mails to inmates. The motion has been fully briefed and I have heard evidence and argument. For the following reasons, I will grant the plaintiff's motion and preliminarily enjoin the defendants from refusing to deliver the plaintiff's mailings on the grounds that such publications are printed on colored paper or bound with glue or staples. Additionally, I will order the defendants to promptly advise the plaintiff of the

grounds for the rejection of any of its publications and to provide the plaintiff with a reasonable opportunity to be heard regarding any rejections.

I. FINDINGS OF FACT.

As required by Federal Rule of Civil Procedure 52(a), I make the following findings based on the evidence presented by the parties at the evidentiary hearing and the affidavits and other evidence filed in support of and in opposition to the plaintiff's motion.[1]

Plaintiff Human Rights Defense Center ("HRDC") is a non-profit organization that, among other things, distributes books, magazines, and other information concerning legal news and prisoners' rights. HRDC publishes *Prison Legal News* ("*PLN*"), a 72-page soft cover monthly magazine printed on black and white newsprint. Thousands of people and institutions subscribe to *PLN*, including incarcerated persons at approximately 2,600 institutions throughout the United States. HRDC also publishes about 50 soft cover books designed to educate inmates about the legal system and their rights. One example of such a book is called *Prisoners' Guerrilla Handbook to Correspondence Programs in the United*

---

[1] A preliminary injunction may be granted on the basis of evidence "that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The court has the discretion to decide the matter entirely on the basis of affidavits or on both live testimony and affidavits. *See* Fed. R. Civ. P. 43(c). Findings of fact and law made in conjunction with a preliminary injunction are normally not binding at a later trial on the merits. *See Camenisch*, 451 U.S. at 395.

*States & Canada*. In addition to *PLN* and books, HRDC sends inmates annual report newsletters, brochure packets including order forms, copies of important judicial opinions, and legal letters. HRDC sends inmates who will be incarcerated for a meaningful period of time an initial mail packet and a six-month subscription to *PLN* at no charge. After the free subscription ends, inmates must order and pay for *PLN* to continue receiving it.

Defendant Southwest Virginia Regional Jail Authority ("Jail Authority") operates four jails that are located in Abingdon, Haysi, Duffield, and Tazewell, Virginia. The Jail Authority houses approximately 2,000 inmates across its four facilities, with the largest facility, Abingdon, housing about 820 incarcerated posttrial and pretrial detainees. Some inmates are housed in a Jail Authority facility for only a few days while others are there as long as three years. Inmates at the Jail Authority's facilities are housed in varying levels of security from minimum to maximum security. The Jail Authority's facilities have housing units that are single-cell, double-cell, four-person, six-person, and dormitory style housing arrangements. Each housing unit contains 80 to 90 inmates.

HRDC has on a number of occasions attempted to send its publications to inmates at the Jail Authority's facilities, but rather than delivering the items to the inmates, the Jail Authority has confiscated them. The Jail Authority implemented

a policy effective March 1, 2015, banning personal material sent to inmates from outside publishers. According to the Jail Authority's Superintendant Stephen Clear, the policy was adopted because of concerns about inappropriate material; lack of space in the property rooms at the facilities; fire hazards; safety concerns regarding staples, which could be used for weapons or tattooing; and the possibility that colored papers and glue could be laced with drugs. However, no written policy addresses staples or glue, and the Jail Authority has confiscated mailings from HRDC that do not contain glue, staples, or colored paper.

On June 1, 2016, the Jail Authority amended its policy to allow inmates to order books from publishing companies subject to case-by-case approval. The Jail Authority accepts donations of materials to its library, subject to approval. However, one inmate declared that in practice, the Haysi facility stopped accepting library donations around 2013. The Jail Authority's written policies regarding publications, mail, and donated materials do not list any criteria for determining which items will be accepted and which will be rejected.

Some inmates are unaware that they are allowed to order books. The delivery and confiscation of mail is inconsistent and the policies are applied differently depending on which correctional officers are working. Some inmates have not received mail they know was sent to them by family members and

friends. Sometimes prisoners receive confiscation forms for confiscated materials, but sometimes they do not. One inmate filed a grievance regarding the confiscation of his mail but did not receive any response to the grievance.

None of the Jail Authority's facilities allow inmates to physically access jail libraries. Rather, at the Haysi and Tazewell facilities, inmates have access to book carts sporadically, about twice a month. The book carts contain a limited number of books, many of which are missing pages or are otherwise damaged, and the carts are rarely refreshed with new books. Inmates at the Abingdon facility receive library slips with which to request books every two weeks, but they do not always receive the books they have requested. The Abingdon library contains about 5,000 books.

The Jail Authority provides one local newspaper and one national newspaper to be shared among all the inmates in a housing unit. Inmates also have access to an electronic kiosk containing certain court opinions and other limited legal information, but they are only able to use the kiosk for up to 30 minutes at a time and are not guaranteed access to it on any given day. The Jail Authority does not allow inmates to have magazines at all, and inmates are not permitted to receive newspapers other than those provided by the Jail Authority. The Jail Authority restricts newspapers and magazines in an effort to control clutter.

Inmates are allowed to order books from publishers, subject to certain restrictions. The books must be legal, religious, or educational in nature and cannot have hard covers. Soft cover books are usually bound with glue, but this does not pose a significant risk because books sent directly from a publisher usually do not contain drugs or other contraband. Publications containing colored paper are not allowed because Suboxone strips can be melted onto paper and are difficult to detect on colored paper. This, too, is less of a concern for publications mailed directly from a publisher than for those mailed by individual senders. When an inmate receives a book and the Jail Authority administration is not aware that the inmate ordered the book, an administrator calls the publisher or sender to confirm that the inmate ordered the book.

Inmates have in the past put staples into toothbrushes and other objects to fashion weapons. Inmates sometimes fashion tattoo guns out of found objects including staples. Currently, most of the staples used for these purposes come from documents delivered by attorneys, as magazines containing staples are prohibited in the Jail Authority's facilities. Tattooing is a problem for the Jail Authority because it can lead to infections and other medical problems that require costly treatment. The Jail Authority's annual budget is about $45,000,000, and inmate medical costs account for $9,000,000 to $10,000,000 of the budget.

The Jail Authority limits the number of items of personal property each inmate can have in his or her possession. If an inmate receives items in the mail that exceed that number, the inmate can choose to have the extra items destroyed or returned to the sender at the inmate's expense. Because of this policy, delivery of HRDC's publications would not contribute to overcrowding of cells or create a fire hazard. Cells must be searched daily, and a few additional books or magazines per inmate would not increase the number of cell searches. The Jail Authority's facilities contain ample space for reading materials in the cells and common areas.

The Jail Authority has confiscated issues of *PLN*, *Prisoners' Guerrilla Handbook*, an annual report and fundraising newsletter, legal letters, informational brochure packets, and court opinions. HRDC has identified at least 222 items it sent to persons incarcerated at the Jail Authority's facilities that were not delivered to the intended recipients. In a few instances, these items were returned to HRDC using the Postal Service's Return to Sender service because the inmate-recipient had been transferred to another facility or was no longer present at the facility when the mail arrived.

On two occasions, the Jail Authority provided HRDC with confiscation forms identifying the materials it had confiscated. These forms pertained to confiscated copies of *PLN*. The confiscation forms state that the sender can appeal

a confiscation decision within ten days. In December 2016, HRDC received a confiscation form but did not appeal the confiscation. In January 2017, HRDC appealed a confiscation decision, but the appeal letter was not received by the Jail Authority within ten days of the confiscation, so the Jail Authority ignored it. It took four and five days for HRDC to receive the confiscation forms, leaving only a few days in the ten-day appeal window for HRDC to respond. The confiscation forms sent to HRDC do not state why the issues of *PLN* were confiscated.

HRDC has not attempted to send copies of *PLN* that are free of staples or in an electronic format. Inmates do not have access to computers other than the kiosks, and access to the kiosks is limited in time and not guaranteed. HRDC has not tried to donate its publications to the facility libraries.

One mail clerk works at each of the Jail Authority's facilities. An administrative worker also assists with mail processing as needed. Each day, the mail clerk goes to the post office to retrieve the mail, returns to the facility, and sorts the inmate mail from the facility mail. The clerk then checks a database to confirm that the inmate to whom the mail is addressed is still located at the facility. If the inmate is at the facility, the clerk writes down the housing unit and bed number. If the inmate is not present, the clerk places a "Return to Sender" stamp on the envelope and sets it aside to be returned to the post office the next day. The

mail to be delivered to an inmate is then opened, scanned, and screened for contraband, escape plans, or other problematic content. The envelope flap, stamp, and any mailing label are removed, as are any staples. The mail is then sorted into mail bins by housing unit and a correctional officer delivers each housing unit's mail to the recipient inmates.

When books are donated to the facility libraries, Jail Authority staff members remove any mailing labels from the books and check them for contraband. In addition, they remove the spines from any donated hard cover books. All mail received at the Jail Authority's facilities must be examined for contraband before being given to an inmate. It is significantly more cumbersome for the Jail Authority to reject an item than to accept it. When a mailroom worker rejects a piece of mail, the worker must complete a confiscation form, package the item, log it, and mail the form, and the decision can be appealed. When a magazine or other publication is accepted, it takes only a few seconds for a mail room worker to process the item.

John Clark, a former official with the federal Bureau of Prisons, testified as an expert on behalf of HRDC. Based on Clark's testimony, the Jail Authority's policy of prohibiting staples, colored paper, and glue is highly unusual within correctional facilities. The staples used in *PLN* are small and flimsy and are

unlikely to be used to tamper with restraints or fashion weapons.  *PLN* is delivered to several maximum-security prisons and to all state prisons in Virginia, and none of these other institutions have raised any concerns about *PLN*'s use of staples.  Numerous everyday items found in jails could theoretically be used as weapons by inmates, but it is not practical to ban all such items.  Nearly all jails and prisons have books that contain glue or colored paper.

Giving inmates access to a variety of books, magazines, and newspapers of interest to them serves a rehabilitative function and also helps to prevent the mischief that can proliferate when inmates are idle.  At the same time, jail officials have a legitimate interest in keeping certain types of materials out of the hands of inmates, such as content that is likely to incite violence or encourage illegal acts.

HRDC's publications do not contain colored paper, except on the covers of the paperback books.  The paperback books are also the only publications that contain glue.  HRDC is unaware of any cost-effective way to bind *PLN* and its annual report and fundraising newsletter without using staples.  These two publications are printed, bound, addressed, and bundled by zip code by a third-party printer located on the west coast, while HRDC's offices are located in Florida.  Donating the publications to the library would delay each prisoner's

access to the materials, rendering them less relevant and unhelpful in preparing time-sensitive legal filings.

The cost to the Jail Authority of employing an additional correctional officer to sort and deliver mail would be approximately $50,000, and the Jail Authority requests a bond in that amount. However, I find that an additional staff member is not required in order to process HRDC's publications. HRDC is a relatively small nonprofit organization with 19 employees. It has considerable assets and has received significant sums in court-ordered attorneys' fees, but those funds are essential for carrying out its educational and advocacy missions. In its 28-year history in which it has obtained dozens of injunctions and consent decrees, HRDC has never been required to post a bond.

## II. ANALYSIS.

A preliminary injunction is an extraordinary remedy that should only be granted "if the moving party clearly establishes entitlement to the relief sought." *Hughes Network Sys., Inc. v. Interdigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (internal quotation marks and citation omitted). A preliminary injunction is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm

in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

*A. Likelihood of Success on the Merits.*

HRDC contends that the defendants are violating its First Amendment free speech rights by refusing to deliver its publications and its Fourteenth Amendment right to due process by failing to give adequate notice of the confiscations and a reasonable opportunity to respond. "[T]here is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). When a jail confiscates a publication sent by a publisher, it must give the publisher notice and an opportunity to respond. *See Montcalm Publ'g. Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996).

Prison regulations that infringe upon constitutional rights will only be upheld if they are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Legitimate penological objectives include maintaining safety and security and saving scarce prison resources. *United States v. Stotts*, 925 F.2d 83, 86 (4th Cir. 1991). A court reviewing a regulation must consider four factors: (1) "whether the governmental objective underlying the

in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

*A. Likelihood of Success on the Merits.*

HRDC contends that the defendants are violating its First Amendment free speech rights by refusing to deliver its publications and its Fourteenth Amendment right to due process by failing to give adequate notice of the confiscations and a reasonable opportunity to respond. "[T]here is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). When a jail confiscates a publication sent by a publisher, it must give the publisher notice and an opportunity to respond. *See Montcalm Publ'g. Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996).

Prison regulations that infringe upon constitutional rights will only be upheld if they are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Legitimate penological objectives include maintaining safety and security and saving scarce prison resources. *United States v. Stotts*, 925 F.2d 83, 86 (4th Cir. 1991). A court reviewing a regulation must consider four factors: (1) "whether the governmental objective underlying the

regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective"; (2) "whether there are alternative means of exercising the right that remain open"; (3) "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison"; and (4) whether there are "obvious, easy alternatives" suggesting that the regulation is an "exaggerated response" to prison concerns. *Thornburgh*, 490 U.S. at 414, 417, 418 (internal quotation marks and citation omitted).

Regarding the first factor, when a regulation addresses materials coming into the facility, prison authorities are entitled to broad discretion. *Id.* at 416. That discretion is not without limits, however. Here, the defendants' stated objectives underlying confiscation of HRDC's publications are preventing prisoners from obtaining drugs and staples that could be used for tattooing or as weapons. The defendants also assert that the restrictions on publications are intended to promote fire safety. These are legitimate concerns in a prison context, but the restrictions are not rationally related to those objectives because items sent directly from publishers are unlikely to contain drugs and there are other policies in place that minimize fire hazards. The only one of the policies at issue that is rationally related to the stated objective is the Jail Authority's apparently unwritten policy of prohibiting publications that are bound with staples.

It also appears that the Jail Authority's policies are not being applied in a neutral or rational way, as a number of the mailings that have been confiscated do not contain colored paper, glue, or staples. As to the plaintiff's due process claim, the defendants do not contest that they have failed to comply with their policy requiring notice of confiscations, and the few notices that have been sent to HRDC have not stated the reasons that the subject mailings were confiscated. The defendants have offered no rationale for the short ten-day appeal window, which is unreasonable in light of the time necessary to send and receive the notices and responses by mail.

HRDC has no adequate alternative means of exercising its First Amendment right to communicate with prisoners. The defendants have not offered any evidence showing that materials donated to the facility libraries would reach the intended recipients in a timely fashion, or at all. HRDC has shown that library items are distributed to inmates infrequently and that inmates do not always get the materials they request. Thus, the defendants' suggestion that HRDC should donate its publications to the facilities rather than sending them directly to inmates is not an adequate alternative. Nor should HRDC be required to incur the substantial additional burden of having publications that will be sent to the Jail Authority separately printed without staples, glue, or colored paper.

Acceptance of the publications at issue would have a minimal impact on the Jail Authority's staff or other inmates. Staff members already remove the spines from donated hard cover books and examine all incoming mail and donated items for contraband. Mailroom workers could remove staples from an issue of *PLN* or remove the colored-ink cover of a book in less time than it would take to complete, log, and mail a confiscation form. These obvious, easy alternatives to rejecting all of HRDC's mailings outright show that the defendants' restrictions are an exaggerated response to the stated concerns. I therefore conclude that HRDC is likely to succeed on the merits of its claims.

### B. Irreparable Harm.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). HRDC has clearly shown irreparable harm, satisfying the second *Winter* factor. I find that this element is not undermined by any delay of HRDC in filing suit and seeking a preliminary injunction.

### C. Balance of Equities.

As indicated in Part II.A, *supra*, compliance with the preliminary injunction would pose a minimal burden to the defendants. The defendants' overbroad policies, which are being applied in an unequal fashion that is at best arbitrary and

at worst discriminatory, call into question the defendants' motives. HRDC has attempted to comply with the vague written policies to the best of its ability despite the defendants' lack of communication. I find that the balance of equities favors the plaintiff.

### D. Public Interest.

The Fourth Circuit has stated that "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). The public also has an interest in the education and rehabilitation of inmates, an interest which is furthered by allowing them access to books and other publications. Moreover, providing prisoners with timely information about their legal rights serves the important public interest of ensuring meaningful access to the courts and vindication of those rights. Preliminary injunctive relief is therefore in the public interest.

### E. Bond.

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Although I may waive the security requirement, I "must expressly address the issue of security before allowing any waiver and cannot

disregard the bond requirement altogether." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (internal quotation marks and citation omitted).

I find that the preliminary injunction will not necessitate the hiring of additional staff or cause the Jail Authority to incur any significant monetary cost. I therefore find a bond unnecessary and will waive the bond requirement.

### III. CONCLUSION.

For the reasons given, it is **ORDERED** that the Motion for Preliminary Injunction, ECF No. 4, is GRANTED. A separate Preliminary Injunction will be issued forthwith.

ENTER: July 3, 2018

/s/ *James P. Jones*
United States District Judge