# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | |
|---|---|
| HUMAN RIGHTS DEFENSE CENTER, ) | |
| ) | Case No. 1:18CV00013 |
| Plaintiff, ) | |
| ) | |
| v. ) | **OPINION AND ORDER** |
| ) | |
| SOUTHWEST VIRGINIA REGIONAL JAIL AUTHORITY, ET AL., ) | By: James P. Jones |
| ) | United States District Judge |
| ) | |
| Defendants. ) | |

*Sean M. Douglass and Thomas S. Chapman, Williams & Connolly LLP, Washington, D.C., and Daniel Marshall, Human Rights Defense Center, Lake Worth, Florida, for Plaintiff; Nathan H. Schnetzler, Frith Anderson + Peake, P.C., Roanoke, Virginia, for Defendants.*

The defendant jail authority prohibited prisoners in its jails from obtaining magazines or other periodicals or from obtaining books unless the prisoner received prior permission to order the book in question. A prisoners' rights organization sued under 42 U.S.C. § 1983, asserting that these policies violated its First Amendment and due process rights as a publisher of magazines and books, and seeking damages and injunctive relief. On cross motions for summary judgment, I find sufficient evidence that the plaintiff's rights were violated as alleged, although I find that the jail authority's superintendent is entitled to qualified immunity as to the plaintiff's First Amendment claim. The case will

proceed to a jury trial on damages, with a later hearing before the court to determine injunction relief.[1]

I.

The following facts are taken from the summary judgment record and are undisputed except where noted.

Plaintiff Human Rights Defense Center ("HRDC") is a non-profit organization that, among other things, distributes to inmates books, magazines, and other information concerning legal news, prisoners' rights, and current events. It is a small organization with approximately 19 employees. HRDC publishes two monthly magazines, *Prison Legal News* ("*PLN*") and *Criminal Legal News* ("*CLN*"), which are both printed on black and white newsprint and bound with staples. *PLN* is 72 pages long and *CLN* is 48 pages long. The printer of the magazines prints individual addressee and pre-paid mailing information directly onto each issue and delivers bundles of the magazines, sorted by ZIP Code, to the United States Postal Service for delivery. Over the past 29 years, more than one million copies of *PLN* have been printed and delivered to inmates at more than 3,000 correctional facilities, including all state prisons in Virginia. In addition,

---

[1] Suit was filed on March 28, 2018. The court entered a preliminary injunction on July 3, 2018, which prohibited the defendants from rejecting the plaintiff's publications under certain circumstances.

HRDC publishes an annual report that is printed and mailed in the same format as *PLN* and *CLN*.

HRDC also publishes and distributes a number of soft-cover books, which are printed in black-and-white with colored covers, bound with glue, and sent to recipients in cardboard boxes with mailing addresses printed directly on the boxes. Two such books are at issue in this litigation: *Prisoners' Guerrilla Handbook to Correspondence Programs in the United States and Canada* ("*Prisoners' Guerrilla Handbook*"), which provides information on educational and vocational programs available to inmates, and *The Habeas Citebook: Ineffective Assistance of Counsel* ("*Habeas Citebook*"), which contains legal analysis related to habeas corpus actions with citations to cases and statutes.

Defendant Southwest Virginia Regional Jail Authority ("Jail Authority") operates four jails that house nearly 2,000 pretrial detainees and inmates serving short sentences. About 800 prisoners are held at the Abingdon facility, about 600 are held at the Duffield facility, about 300 are held at the Haysi facility, and about 200 are held at the Tazewell facility. The Jail Authority houses inmates of varying security levels ranging from minimum to maximum. The average length of stay at the Tazewell facility is 50 days, and the average length of stay at the other three facilities is 100 days. Many offenders are housed at one of the Jail Authority's

facilities for only a brief time, from several days to several weeks. The inmates are housed in housing units that each hold between eight and 90 prisoners. The Abingdon facility is the only facility with a housing unit that can hold 90 inmates, and that housing unit is not always filled. Defendant Stephen Clear, the Jail Authority's superintendant, adopts policies governing the management and operations of the four jail facilities.

Each of the four facilities has a book room where donated books are stored. Prisoners are not permitted to visit the book rooms, and they are not given a list of the books contained in the book rooms. They can, however, request to borrow up to two books at a time every two weeks. They can ask staff whether certain books are available. Prisoners do not always receive each book they request to borrow, even if a prisoner's family member donated the book with the intention of it reaching that particular prisoner.

Prisoners may order books from publishers or retailers through a preapproval process. Orders are approved only for books that the Jail Authority deems to be religious, legal, or educational. There is no written list of criteria for determining whether a book falls into one of these categories. *PLN* is considered non-legal mail, but the Jail Authority considers *Habeas Citebook* to be legal. Prisoners are given a canvas bag and can possess as many pieces of mail or books

as will fit in the bag.  There is no specific number of books that a prisoner is allowed to possess at one time, although Jail Authority personnel at the Abingdon facility have limited prisoners to two or four books.  Each prisoner is allowed to possess no more than ten photographs.

Magazines are prohibited in the Jail Authority's facilities.  Prisoners may not order them, and the book rooms do not contain any for prisoners to borrow.  Nor are prisoners allowed to order newspapers.  The Jail Authority provides a daily copy of a national newspaper and a weekly copy of a local newspaper to each housing unit.  The Jail Authority asserts that it does not have the staff resources to deliver newspapers and magazine subscriptions to individual inmates daily.  However, HRDC suggests that delivering its mailings would require no greater expenditure of staff time than rejecting them, which is a cumbersome process.  It further asserts that accumulation of newspaper and magazine subscriptions would create a fire hazard.  In addition, inmates have frequently stuck newspaper and magazine clippings to cell walls and used them to cover vents.

Each of the facilities has a computer law cart, which is loaded with cases, statutes, and other legal materials provided by a third-party contractor.  The law cart computers are not connected to the internet.  Prisoners must request to use the law cart in advance and are allowed to use it once per day for 30 minutes, with

longer periods of use occasionally permitted when there are no other prisoners waiting to use it. Sometimes prisoners have been scheduled to use the law carts but have not been given the opportunity to do so. The law carts are only available for inmates to access on weekdays. The law carts contain software called Casemaker, which offers federal and 50-state primary law coverage. Prisoners can purchase printed copies of materials from the law carts for 15 cents per page. The law carts are not used to their full capacity by inmates and often are not accessed for days at a time.

The Jail Authority generally rejects all publications mailed to prisoners in its custody, although employees have in their discretion permitted some publications to be delivered. A written policy titled "Inmate Communications" governs the acceptance or rejection of mail sent to prisoners. The version of the policy in effect from October 2017 through July 2018 contains the following provisions relevant to this action:

> [Contraband is] [a]ny item or article in the possession of an inmate that they are not allowed to possess. For the purpose of this policy, contraband may be any item received through the mail that inmates are not allowed to possess.
>
>     . . . .
>
> Written notice of seizure of all inmate mail shall be given to the inmate and sender, whose mail is found to contain contraband. Such notice will contain the reason for the seizure. The sender shall have

the opportunity to appeal the decision to the Jail Administrator, unless the Seizure is held for criminal investigation.

. . . .

Magazines, newspapers, periodicals, or other such correspondence are disallowed. These items may be provided from the library.

. . . .

When deemed necessary to remove any item from incoming mail the Chief of Security or designee will be notified immediately. A written record shall be made in the form of an incident report in JMS. Such record shall include:

    a. Inmate's name and booking number.
    b. Description of the item in question.
    c. Description of the action taken and the reason for same.
    d. Disposition of the item involved.

. . . .

When contraband is found which is not otherwise illegal, but is not allowed in the possession of an inmate, a notice shall be sent to the inmate and the sender with a written reason for the seizure. The sender will be allowed the opportunity to appeal and challenge the seizure before the Chief of Security. Unless is it needed for a criminal investigation or prosecution, property which can legally be possessed outside the facility shall be returned to sender, placed in the inmate's property to be returned upon release, or destroyed. The notice shall indicate the nature of the contraband and why it is being denied.

. . . .

If the original sender does not reply within a reasonable amount of time about the seizure within 5 business days, all such items described in # 3 above will be shipped to an address provided by the inmate at the inmates [sic] expense or destroyed at the inmates [sic] request.

. . .

> Packages shall not be accepted. All packages shall be marked, "Return to Sender", and placed in the outgoing mail (with the exception of Work Release inmates).

Mem. in Supp. of Pl.'s Mot. for Summ. J. & Permanent Inj. Ex. 14 at 3-4, 6-7, ECF No. 57-14. The Inmate Communications policy was signed by Clear on October 10, 2017, and remained in place until July 2018, when this court issued a preliminary injunction in this case. The previous version of the policy, which was signed by Clear in 2013, was not materially different.

The policies surrounding books were inconsistently communicated to inmates. One employee told an inmate that only religious materials sent directly from the publisher were allowed. Another employee told an inmate he could request legal materials from the library by writing to his counselor. Some inmates were told by staff that they were not allowed to order any books at all.

In March 2016, a nearby jail authority entered into a consent decree with HRDC regarding similar issues, and Clear referenced that decree in an email in March 2016. Regarding the consent decree, Clear wrote, "Take a look at the decree, basically says we cannot stop magazines and books." *Id.* at 2, ECF No. 57-24. Clear contacted administrators of a number of other correctional facilities in

Virginia and learned that many of them allow inmates to order books and magazines.

HRDC has sent publications to Jail Authority inmates since 2016, some solicited and some unsolicited. HRDC has a practice of sending complimentary sample copies of its magazines and books to inmates, who then have the option to subscribe to the magazines or purchase additional books. Various prisoners wrote to HRDC to say that they had not received the publications that were sent to them. The Jail Authority had confiscated many of the publications and had marked others "Return to Sender."

When a Jail Authority mailroom employee decides to accept mail for delivery to a prisoner, the employee only needs to place it in a mail cart for distribution. When an employee decides to confiscate mail, however, the employee must place it in a bag, complete and file a confiscation form, send the form to the sender, await a response, and destroy the mail if no response is received. When mail is returned to the sender, the employee is supposed to write on the packaging the reason for its return.

At least 50 of HRDC's books and magazines were confiscated across three of the Jail Authority's four facilities, including 31 issues of *PLN*, 12 issues of *CLN*, six copies of *Prisoners' Guerrilla Handbook*, and one copy of the *Habeas*

*Citebook*.  These confiscations are reflected in confiscation forms.  No confiscation forms exist for confiscations at the Tazewell facility, although mailings were confiscated or rejected at that facility.

Before filing the instant suit, HRDC received seven confiscation forms from the Haysi facility, all of which pertained to confiscations of *PLN*.  Two of the forms were dated December 15, 2016, and were received by HRDC four days later. The other five were dated January 18, 2017, and received by HRDC five days later. All seven forms stated the reason for confiscation as "NOT ALLOWED," with no further elaboration.  The forms stated that the confiscated magazines would be destroyed if no response was received within 10 days of the date of confiscation. HRDC did not appeal or attempt to contact the Jail Authority about the confiscations within the 10-day window.  One form stated that the Jail Authority had destroyed an issue of PLN the day after it was confiscated because neither the sender nor the inmate had yet responded.

On February 22, 2016, the Chief of Security at the Duffield Facility issued a memorandum informing inmates that effective March 1, 2016, the facility would "no longer accept books from outside vendors" and that all books received at the facility after that date would be returned to the sender.  *Id*. at Ex. 27 at 28, ECF No. 57-27.  The Jail Authority adopted a policy in 2015 prohibiting books from outside

vendors due to concerns about overcrowding and safety concerns. On June 1, 2016, the Jail Authority amended its policy to allow books to be ordered subject to preapproval on a case-by-case basis.

On January 26, 2017, HRDC sent the Jail Authority a letter appealing the confiscation of *PLN* issues to inmates at the Haysi facility. The letter did not reference a specific prisoner or issue, but rather referred to the broader "decision to censor *PLN* which was sent to numerous prisoner-subscribers." *Id*. at Ex. 30 at 3, ECF No. 57-30. On the day the Jail Authority received the letter, Clear asked two employees whether the Jail Authority's facilities allowed prisoners to receive *PLN*. He then discussed the letter with employees at each facility. The Jail Authority did not send a response to the letter.

Two to three months after the filing of this lawsuit, the Jail Authority completed 32 additional confiscation forms for HRDC's mailings, which stated that the mailings had been confiscated because they were books, magazines, contained staples, or were "NOT ALLOWED FOR SECURITY REASONS." *Id*. at Ex. 29 at 27, ECF No. 57-29. HRDC received only 11 of these 32 additional forms. Some forms stated that the sender could appeal within five business days, while others set an appeal deadline of 10 days.

The Jail Authority sometimes returned mailings because the recipient was no longer housed at the facility, in which case an employee would write a message communicating that fact on the mail itself. Sometimes mail was refused and returned for no stated reason or for a vague reason such as "not allowed." *Id. at* Ex. 3 at 56, ECF No. 57-3. HRDC indicates that it has received at least 176 returned mailings from the Jail Authority since 2016.

According to the Jail Authority, more than 200 pieces of mail were returned to HRDC because they were undeliverable as addressed. HRDC did not revise its subscription database after receiving notices that recipients were no longer housed at the facility identified. HRDC did not attempt to contact the facility to verify address information. HRDC looked up inmate locations on a Virginia Department of Corrections database, but the Jail Authority contends it has no control over that database and cannot guarantee its accuracy. According to the Jail Authority, HRDC could have used the Jail Authority's own inmate locator database or contacted the Jail Authority directly, but it did not do so.

Providing adequate reading material to inmates serves the interest of rehabilitating inmates and of preventing security problems by avoiding idleness, boredom, and disruptive behavior. The Jail Authority has stated that it prohibits magazines and books because possession of them by inmates can pose a fire risk.

Other Jail Authority policies restrict the amount of paper items and personal property an inmate can possess. Inmates are permitted to store a limited amount of property in the facilities' property rooms, and when an inmate exceeds that limit, the inmate can choose to have the extra items destroyed or sent home at the inmate's expense. Inmates may also possess as many mail items as will fit in a Jail Authority-issued canvas bag.

The Jail Authority has stated that it prohibits magazines because the staples used to bind them pose security risks. Inmates use the staples to fashion tattooing guns, weapons, and tampering devices. Fifty to 75% of the Jail Authority's inmates have Hepatitis C, which can be spread through tattooing. Treating Hepatitis C is very costly for the Jail Authority. Injuries caused by staples and other sharp objects, inflicted on inmates by themselves or other inmates, can result in increased medical costs for the Jail Authority.

Jail Authority employees remove staples from legal mail before giving it to prisoners. Despite prohibiting staples in the facilities, inmates have managed to obtain staples, most often from documents brought to them by their attorneys. Other items regularly possessed by inmates can also pose security risks when used improperly, such as pens, and razors, and even socks.[2]

---

[2] A common prison weapon is fashioned by placing a heavy object, such as a

HRDC is unaware of an alternative means of binding *PLN* and *CLN* that does not involve staples. If such a method existed, it would probably be cost-prohibitive. The Jail Authority notes, however, that HRDC could print its magazines tabloid-style, without staples, which it contends would be cheaper than binding them with staples. Were HRDC required to remove staples from the magazines, place the magazines in envelopes, and mail them separately to inmates at the Jail Authority, it would incur significantly more costs in doing so. Currently, the magazines are sent directly from the printer using a bulk mail rate.

The Jail Authority also contends that it has rejected HRDC's softcover books because they contain colored paper and binding glue. The only colored ink appears on the covers of some of the softcover books. The concern with binding glue is that it could contain drugs. Typically, when an inmate orders a book from a publisher and the book is bound with glue, the Jail Authority allows the book to be delivered because books sent directly from publishers do not pose the same risks of drug smuggling as books sent from friends and family members. Similarly, colored ink is a concern because certain drugs can be melted onto the paper and colored ink makes the drugs particularly hard to detect. This, too, is not a

---

lock, in the toe of a sock, and swinging the sock like a flail. *See Binns v. Virginia*, No. 1:13CV00086, 2015 WL 1477910, at *1 (W.D. Va. Mar. 30, 2015) (describing a "lock in a sock").

significant concern with books sent directly from the publisher. Mailroom employees attempt to discern whether a book was sent from a publisher or from an individual by examining the return address and packaging.

The Jail Authority removes the spines and covers from donated hardcover books, and it removes any glue or stickers from books and mail items before delivering them to inmates. As recently as January 2017, the Jail Authority allowed inmates at the Duffield facility to possess *Reader's Digest*, which is bound with glue. Assistant Superintendant Lockhart testified in the Jail Authority's Rule 30(b)(6) deposition that it had not been a problem to allow the prisoners to have this glue-bound publication. Inmates are allowed to have up to 10 photographs in their cells, and these photographs contain colored ink which can also be used for smuggling drugs.

On April 10, 2018, Lockhart sent an email to various Jail Authority employees, copying Clear, in which he instructed the employees, "If you get any mail in that comes from PLN (Prison Legal News), please hold this and let me and Steve look at it. Thanks." Pl.'s Mem. Supp. Ex. 38, ECF No. 57-38. On May 15, 2018, Lockhart emailed three jail administrators, copying Clear, stating, "I still have not received your letters containing the procedures your mail room goes by in dealing with what they allow in and or why they don't allow something in. I need

this by Friday so a policy can start to be formed." *Id.* at Ex. 40, ECF No. 57-40.

Major Brian Parks, administrator of the Duffield jail, wrote in response that

magazines and periodicals are not allowed and are thus confiscated. Major Johnny

Billiter, administrator of the Haysi jail, wrote that staples are removed from

religious mail and that "BOOKS RECEIVED THAT ARE NOT BIBLE STUDIES

ARE CONFISCATED AND PUT IN THE INMATE'S PROPERTY." *Id.* at Ex.

42 at 3, ECF No. 57-42. Major J.R. Stanley of the Tazewell jail wrote that his

facility also did not allow staples or colored ink and that "[w]e are going to start

doing what Abingdon is doing in regards to books even religious." *Id.* at Ex. 43,

ECF No. 57-43.

In August 2018, after this court had entered a preliminary injunction, the Jail

Authority amended its Inmate Communications policy. The amended policy states

that newspapers and periodicals are prohibited, but that "[a]lternative reading

materials may be ordered from a publishing company on a case by case basis, upon

approval from the Jail Administrator or designee." *Id.* at Ex. 44 at 4, ECF No. 57-

44. The current policy no longer calls for the rejection of all packages, but rather

states that packages shall be opened and their contents reviewed for approval by

the Jail Administrator on a case-by-case basis. The appeal deadline is now listed

as 10 days rather than five.

When inmate mail is received, a mail clerk must look up each offender to determine whether the offender is still housed at the facility. Mail is delivered to inmates by corrections officers. The Jail Authority asserts that a substantial increase in mail will mean the officers have less time available to focus on safety and security. Because HRDC's magazines are published monthly, an inmate who subscribes to them may be released before receiving the first issue. If an inmate does not notify the publisher of his release or transfer, the magazines will continue to be sent, resulting in wasted time spent sorting mail. The Jail Authority does not have the staff resources to search every cell every day to uncover violations of property limits. The Jail Authority suggests that HRDC could provide PDF versions of its magazines and other publications to be printed within the jails for distribution to inmate subscribers; however, the Jail Authority has not explained how this would work logistically. The Jail Authority currently maintains PDF versions of its publications but does not distribute the publications in electronic format.

## II.

The court is required to grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling

on cross-motions for summary judgment, the court must, "[w]ith respect to each side's motion, . . . view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." *Kolbe v. Hogan*, 849 F.3d 114, 130 (4th Cir. 2017). "Rule 56 expressly contemplates the availability of summary judgment to a claimant. That a movant bears the ultimate burden of proof or persuasion . . . is no obstacle to a summary judgment award in favor of that party, so long as the requirements of Rule 56 are otherwise satisfied." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 521–22 (4th Cir. 2003) (citations omitted). Summary judgment is not a disfavored procedural shortcut, but an important mechanism for weeding out claims and defenses that have no factual basis. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). It is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).

III.

On the record summarized above, each side contends it is entitled to judgment as a matter of law on both the First Amendment claim and the due process claim. Clear asserts that he is entitled to qualified immunity on both claims.

"[T]here is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). When a jail confiscates a publication sent by a publisher, it must give the publisher notice and an opportunity to respond. *Montcalm Publ'g. Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996).

Prison regulations that infringe upon constitutional rights will only be upheld if they are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Legitimate penological objectives include maintaining safety and security and saving scarce prison resources. *United States v. Stotts*, 925 F.2d 83, 86 (4th Cir. 1991). A court reviewing a regulation must consider four factors: (1) "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective"; (2) "whether there are alternative means of exercising the right that remain open"; (3) "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison"; and (4) whether there are "obvious, easy alternatives" suggesting that the regulation is an "exaggerated response" to prison concerns. *Thornburgh*, 490 U.S. at 414, 417, 418 (internal quotation marks and citation omitted).

The first factor of the *Turner* test is perhaps the most important. If a policy or practice is "arbitrary or irrational" under *Turner*'s first factor, then it is unconstitutional "irrespective" of other factors. *Shaw v. Murphy*, 532 U.S. 223, 229–30 (2001). When a regulation addresses items coming into a correctional facility, prison authorities are entitled to broad discretion. *Thornburgh*, 490 U.S. at 416. That discretion, however, is not without limits.

### *A. First Amendment — Books.*

HRDC asserts that it has established all four elements of the *Turner* test. It argues that the policy prohibiting books except those that are preapproved is not rationally related to a legitimate penological interest in safety or security because it is both overinclusive and underinclusive. The Jail Authority allows inmates to possess other paper items that could pose a fire risk and has allowed inmates to possess other publications that contain colored paper and glue, such as *Reader's Digest,* as well as photographs, which could be used for smuggling drugs. The record contains no evidence that drugs have been smuggled into the Jail Authority's facilities via binding glue. A policy limiting the quantity of books and periodicals an inmate can possess addresses concerns about accumulation of flammable paper items in cells. Likewise, mailroom staff are already in the practice of removing glue and stickers from inmate mail. There is no evidence that

there have been any problems related to books within the Jail Authority's facilities since the court's preliminary injunction went into effect almost a year ago.

Moreover, there are no clear criteria for deciding which books will be preapproved. A Jail Authority official reviews the content of a requested book to decide whether to approve it. The reviewing official has great discretion in deciding which books to allow. The various policies regarding possession and preapproval of books are inconsistently communicated and applied. HRDC further asserts that alternatives newly suggested by the Jail Authority, such as communicating with inmates by letter or telephone, are not adequate means for HRDC to communicate their information to inmates.

As to the second *Turner* prong, HRDC argues that it has no alternative means of getting its books to inmates because donated books are not guaranteed to reach the intended recipient, and inmates do not always receive the books they ask to borrow. There is no procedure by which a publisher can request preapproval; rather, the procedure contemplates an inmate requesting preapproval to order a book. According to HRDC, this process interferes with the publisher's right to send unsolicited books to inmates. HRDC argues that its First Amendment rights cannot hinge upon a third-party inmate's compliance with a preapproval process.

Regarding the third *Turner* prong, HRDC asserts that any burden on Jail Authority staff in delivering HRDC's books would be minimal, as the process for rejecting a book takes a significant amount of time and HRDC does not send a cumbersome number of books to inmates at the Jail Authority. Finally, regarding the fourth prong of the *Turner* test, HRDC contends that enforcing existing policies concerning property possession and mail inspection is an easy, obvious alternative to a policy banning all book orders except those that have been preapproved. This suggests that prohibiting books sent by outsiders is an exaggerated response to perceived problems. *See Turner*, 482 U.S. at 90-91.

The Jail Authority asserts that HRDC has never attempted to donate books to any correctional facility library and has not offered to provide PDF versions of its books to the Jail Authority for dissemination to inmates. It cites several other facilities in Virginia and elsewhere that do not allow inmates to order books. The Jail Authority proffers that it provides inmates with numerous other reading materials, which are underutilized. According to the Jail Authority, inmates routinely break the rules regarding how much property they may possess, and jail staff do not have the time to search every cell every day to ensure compliance.

In *Thornburgh*, 490 U.S. at 403, the Supreme Court considered the constitutionality of a policy that broadly allowed prisoners to receive publications

(including books) but allowed prison officials to reject publications posing security risks. The policy contained a list of reasons that might justify rejecting a publication, but officials were given broad discretion in deciding whether to accept or reject an item. *Id.* at 405 n. 5. The reasons listed in the policy pertained to the contents of the publication and included concerns such as encouraging violence or detailing how to construct weapons. *Id.*

The Court held that on its face, the policy satisfied the four prongs of the *Turner* test. *Id.* at 419. The policy was targeted at the plainly legitimate interest of protecting security. *Id.* at 415. The issue of content-neutrality was a close one, but the Court held that when "prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner*." *Id.* at 415-16. The Court further concluded that the discretion afforded officials was rationally related to the kind of security risks contemplated. *Id.* at 416. As to the alternative means prong of the *Turner* test, the Court noted that "the regulations at issue . . . permit a broad range of publications to be sent, received, and read." *Id.* at 418. Although the Court held that the policy was facially constitutional, it remanded the case for determination of whether the policy had been constitutionally applied. *Id.* at 419.

The book policy in this case differs from that at issue in *Thornburgh* in several important ways. First, the Jail Authority's stated reasons for its blanket ban of books have to do with the physical attributes of the books, not their contents. Other Jail Authority policies and procedures address concerns about fire risks and drug smuggling. Inmates are only permitted to possess a certain amount of property, and incoming items are thoroughly searched. Spines and covers are removed from donated hardcover books. Books sent directly from publishers pose little risk of drug smuggling, and HRDC's books do not contain colored paper or ink except on their covers. The Jail Authority's interests in preventing fires and drug smuggling are certainly legitimate, but the undisputed evidence shows that a complete ban on books sent from publishers is not rationally related to those interests.

Nor does the record evidence demonstrate that the preapproval policy is applied neutrally. It is undisputed that officials consider the contents of books in deciding whether to preapprove book orders, but there is no written policy setting forth any criteria for determining which books will be permitted and which will not. Thus, the Jail Authority officials essentially have unfettered discretion to approve or reject books as they wish, for any reason. Such a policy invites

arbitrary decisions that are driven by individual officials' biases and do not bear a rational relationship to legitimate penological interests.

Importantly for this case, there is no procedure by which a publisher can request preapproval of a book it wishes to send to an inmate. Thus, a publisher is not permitted to send any unsolicited book to any inmate, regardless of its contents and even if it poses no security risk. The Jail Authority suggests that HRDC should ask inmates to request preapproval of books before HRDC sends them, but HRDC's First Amendment right to communicate with prisoners cannot depend upon the prisoner going through the preapproval process. Such a requirement essentially negates HRDC's right to send unsolicited books. See *Hrdlicka v. Reniff*, 631 F.3d 1044, 1049 (9th Cir. 2011) (noting that publisher's "First Amendment interest in distributing and receiving information does not depend on a recipient's prior request for that information.") While in theory HRDC could call an inmate on the phone to convey information contained in the books or mail copies of book pages in an envelope with a letter, I find that these are not adequate alternatives to communicating the books' valuable and time-sensitive legal, health-related, and educational information to inmates. It is further undisputed that donated books are unlikely to reach their intended recipients in a timely fashion and may not reach them at all. HRDC has met its burden of demonstrating that the

Jail Authority's book ban and preapproval process leaves open no alternative means for HRDC to exercise its right communicate with prisoners.

Having found for the plaintiff on the first and second *Turner* prongs, it is unnecessary to consider the third and fourth prongs. Nevertheless, I note that there is no evidence that permitting books sent by HRDC would likely pose a security threat. The record is devoid of evidence that books sent to Jail Authority inmates have caused problems since the preliminary injunction has been in effect. The Jail Authority has easy alternatives to the book ban — namely, continuing to enforce its other policies and procedures governing property limits and inspection and processing of mail and books. Instead of rejecting all unsolicited books sent by HRDC, the Jail Authority could instead accept the books and remove their spines and covers, as it already does for books donated to the library. HRDC sends a relatively small number of books to Jail Authority inmates, and there is no evidence that processing its books in this way would burden the Jail Authority's resources.

Based on the undisputed record evidence, HRDC has met its burden of proving that the policy prohibiting books except those for which an inmate obtains preapproval fails to satisfy the four-part *Turner* test and thus violates HRDC's rights under the First Amendment. The Jail Authority, on the other hand, has not

shown that it is entitled to judgment as a matter of law. I will therefore grant HRDC's Motion for Summary Judgment and deny the Jail Authority's Motion for Summary Judgment on the issue of the outside book ban and preapproval process.

## *B. First Amendment — Magazines.*

The Jail Authority states that it prohibits magazines because it is concerned about the security and safety risks posed by the staples used to bind them. In addition, as with books, the Jail Authority asserts that overaccumulation of paper items in cells creates fire risks and housekeeping hazards.

HRDC asserts that the magazine ban, like the book ban, is both overinclusive and underinclusive because other policies and procedures address the cited concerns and other items permitted in the facilities can pose the same risks that the magazine ban claims to address. HRDC notes that the Jail Authority removes staples from legal mail before delivering it to inmates. Again, it asserts that there are already limits on how many items of property inmates can possess, as well as rules prohibiting them from hanging magazine clippings on the walls and over vents. HRDC further asserts that accepting magazines would take less time than properly rejecting them, which is a multi-step process that involves completing and sending a confiscation form. HRDC points to the lack of evidence showing any significant burden or safety issues arising out of the preliminary

injunction, under which the Jail Authority has been removing staples and delivering *PLN* and *CLN* for nearly a year now.

The Jail Authority points to record evidence of the harms that can be inflicted by staples in the hands of inmates.[3] The Jail Authority asserts that it removes staples from legal mail because that mail is entitled to greater protections than other kinds of mail. It points to other correctional facilities, both within and outside of Virginia, that prohibit inmates from subscribing to magazines. It argues that permitting magazine subscriptions would lead to a flood of periodicals that would overwhelm employees and divert attention from other security measures. The Jail Authority notes that it already offers inmates a wide variety of reading materials, including two newspaper subscriptions for each housing unit. It reminds the court that it is due significant deference in identifying risks to safety and security and in deciding the best ways to address those risks.

Regarding alternatives available to HRDC, the Jail Authority contends that HRDC already sends sample packets of its publications in envelopes from its Florida headquarters, rather than directly from the printer, so it should be able to

---

[3] Some of this evidence is disputed by the plaintiff's expert, John Clark, whose testimony the defendants have moved to exclude. I have taken that motion under advisement and have not yet ruled on it. Counsel for HRDC appeared to concede at oral argument that staples do pose risks to safety and security within the jails. Viewing the record in the light most favorable to the defendants, there is ample evidence from which a jury could conclude that staples pose serious risks in jails and that the defendants have a legitimate interest in preventing inmates from acquiring them.

send staple-free versions of its magazines this way to inmates held at the Jail Authority's facilities. The Jail Authority also suggests that printing *PLN* and *CLN* tabloid-style, without staples, should be less expensive for HRDC than its current printing method. It further asserts that HRDC could send electronic copies of its publications to the Jail Authority, which could then distribute them to inmates.

The Jail Authority relies heavily on *Hause v. Vaught*, 993 F.2d 1079 (4th Cir. 1993), in which the Fourth Circuit ruled against a pretrial detainee who challenged a detention center's policy prohibiting outside publications. *Hause* is distinguishable from this case, however. First, it dealt with the rights of the detainee rather than the publisher. Second, the plaintiff there conceded that the policies at issue were rationally related to a legitimate interest in preventing fires and contraband. *Id.* at 1083. Third, the court focused on the fact that the plaintiff had produced "no evidence" that he would have received the requested publications during his short periods of incarceration and found that because his detention was "quite brief," any limitation on his First Amendment right was "minimal." *Id*. The holding in *Hause* was expressly limited to its facts: "On the facts before us, which involve a short-term detainee seeking damages for limitations placed on the exercise of his constitutional rights during previous periods of short-term confinement, we conclude that the Detention Center's ban on

outside publications was reasonably related to penological interests, and hence constitutional." *Id.* at 1084. For these reasons, the *Hause* decision is not particularly instructive in this case.

I conclude that based on the undisputed facts, and giving jail officials the significant deference to which they are entitled, the Jail Authority has demonstrated that it has a legitimate interest in preventing staples from entering its jails. However, a complete ban of magazines is not rationally related to that interest, nor is it rationally related to the Jail Authority's interest in reducing fire hazards. I reach this conclusion largely because of the existence of the easy, obvious alternative of having Jail Authority employees remove the staples when processing the mail. That alternative, along with the fact that other policies address accumulation of inmate property and prohibit hanging clippings in cells, suggests that the magazine ban is an exaggerated response by the Jail Authority. Simply removing staples from an issue of *PLN* or *CLN* takes no more time than completing and sending a confiscation form. In other words, rejecting these publications poses an equal or greater burden than accepting them and removing the staples. The undisputed evidence is that *PLN* and *CLN* are monthly publications sent to a relatively small number of Jail Authority inmates. The Jail

Authority's stated fear that it will be required to deliver numerous daily periodicals to hundreds of inmates is overblown and unsupported by the evidence of record.

There is a dispute of fact as to whether the Jail Authority would accept donated subscriptions of *PLN* and *CLN* for addition to the facility book rooms. This dispute is immaterial, however, because even if HRDC could donate subscriptions to the book rooms, it is undisputed that the issues may never make their way to their intended recipients, let alone in a timely manner that would allow the inmates to use the information contained therein to attempt to vindicate their legal rights. I find that donating the magazines to the book rooms is a not an adequate alternative means of communicating with inmates.

I also conclude that HRDC should not be required to redesign its entire printing and distribution process — at great cost — in order to deliver staple-free versions solely to the Jail Authority's facilities. HRDC estimates that separately printing and mailing staple-free issues to Jail Authority inmates would cause it to incur as much as five times the cost it now pays to print and distribute its magazines. While that figure is disputed and the Jail Authority suggests it would be cheaper for HRDC to print and send all of its issues without staples, the undisputed evidence is that HRDC has been printing and mailing its issues using the current method for many years, distributing in excess of a million copies to

more than 3,000 correctional facilities across the country. Requiring HRDC to alter its printing and distribution process solely to comply with the Jail Authority's staple ban would be impractical and would place an unfair burden on HRDC. Moreover, until the preliminary injunction was entered, the Jail Authority prohibited all magazines, not limited to those bound with staples. Thus, there is no indication that even staple-free, tabloid-style versions of *PLN* and *CLN* would have been accepted for delivery.

I have considered each party's evidence in the light most favorable to the nonmoving party. I find that HRDC has established that the undisputed facts show that the blanket magazine ban fails to satisfy the *Turner* test, and HRDC is entitled to judgment as a matter of law. I will therefore grant the plaintiff's Motion for Summary Judgment as to its claim that the Jail Authority's magazine ban violates HRDC's rights under the First Amendment. As to the defendants' motion, I conclude that the defendants have failed to show that the undisputed facts entitle them to judgment as a matter of law with respect to the magazine ban, and I will therefore deny their Motion for Summary Judgment on this issue.

## C. Due Process.

In support of its due process claim, HRDC asserts that on more than 200 occasions, the Jail Authority rejected or confiscated its mailings without providing

adequate or any notice of the reason for rejection. A number of the confiscation forms that the Jail Authority generated were never sent to HRDC. Many of the forms that were sent to HRDC contained vague statements of reasons for confiscation or listed no reasons at all. HRDC was given only five or ten days to appeal, and in at least one case, a mailing was destroyed just one day after it was confiscated because HRDC had not yet responded to notice of the confiscation. HRDC notes that in its briefs, the Jail Authority fails to address at least 50 specific confiscations of books and magazines for which no notice was sent. All of the confiscation forms it received pertained to *PLN*; it never received a confiscation form for *CLN*, *Prisoners' Guerrilla Handbook*, *Habeas Citebook*, or the annual report.

The Jail Authority argues that once it gave notice of the reason for rejecting one issue of PLN, it was no longer required to send subsequent notices when it confiscated other issues for the same content-neutral reason. It asserts that HRDC failed to timely or properly appeal the confiscations or rejections and that in most cases, a five- to ten-day appeal window would be adequate for most senders. It notes that HRDC could have contacted the Jail Authority by telephone, email, or fax in order to appeal, but it did not do so.

The Fourth Circuit has held that under the Fourteenth Amendment's Due Process Clause, "publishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate subscribers." *Montcalm Publ'g Corp.*, 80 F.3d at 106. Most of the confiscation notices that the Jail Authority sent to HRDC were plainly inadequate, stating no reason for the confiscation beyond simply stating that the publication was not allowed. For most confiscations and rejections, no notice was given at all. This unquestionably violated the Fourth Circuit's directive in *Montcalm*. Even assuming that one adequate confiscation notice was sufficient to cover all subsequent confiscations of *PLN*, a doubtful proposition, the Jail Authority was still required to provide notice for the other publications it confiscated or rejected.

Given the evidence that HRDC did not receive confiscation notices for several days after they were sent, I find that the five-day appeal window set forth in many of the forms and the former version of the Inmate Communications policy did not grant HRDC an adequate opportunity to be heard. The 10-day appeal window that applied to other confiscations would be reasonable only if the sender's ability to appeal via telephonic or electronic means had been explained on the forms. A 10-day window would not be adequate where the sender must wait for the notice to arrive via the postal service and then allow several days for a

written appeal to be delivered to the Jail Authority by mail. Here, the confiscation forms stated only that the decision could be appealed to the Chief of Security; the available means of submitting an appeal were not listed. In light of that omission, I conclude that the 10-day appeal window was also unreasonable.

HRDC was entitled to notice and an opportunity to be heard regarding the defendants' interference with its First Amendment right to communicate with prisoners. The undisputed facts show that the defendants violated the plaintiff's due process rights as set forth in *Montcalm* by failing to give notice of confiscations, giving inadequate notice, and not providing a reasonable opportunity to appeal. I will therefore grant HRDC's Motion for Summary Judgment as to its due process claim, and I will deny the Jail Authority's Motion for Summary Judgment as to the due process claim.

### D. Qualified Immunity.

Clear invokes qualified immunity as to HRDC's claims against him in his individual capacity. HRDC asserts its First and Fourteenth Amendment claims through the vehicle of 42 U.S.C. § 1983. A claim under 42 U.S.C. § 1983 requires proof of the following three elements: "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997). Government

officials sued in their individual capacities are "persons" within the meaning of the statute, but they may be entitled to qualified immunity. *Hafer v. Melo*, 502 U.S. 21, 25, 31 (1991).

Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Meyers v. Baltimore Cty.*, 713 F.3d 723, 731 (4th Cir. 2013). A defendant asserting qualified immunity has the burden of proving the defense. *Id.* Qualified immunity is immunity from suit rather than merely immunity from liability; therefore, the question of qualified immunity should be decided before trial. *Id.*

A court deciding the applicability of qualified immunity must determine not only "whether a constitutional violation occurred," but also "whether the right violated was clearly established" at the time of the events in question. *Tobey v. Jones*, 706 F.3d 379, 385 (4th Cir. 2013). This is so because "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015) (citations omitted). Courts are free to "skip ahead to the question whether the law clearly established that the [defendant's] conduct was unlawful in the circumstances of the case." *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018) (quoting *Pearson v. Callahan*, 555

U.S. 223, 232 (2009)). A defendant cannot be said to have violated clearly established law unless "'existing precedent . . . placed the . . . constitutional question beyond debate.'" *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The protection of qualified immunity extends to "all but the plainly incompetent or those who knowingly violate the law." *Raub*, 785 F.3d at 881 (citation omitted).

I find that Clear is entitled to qualified immunity on the First Amendment claim because existing precedent did not clearly establish that the Jail Authority's book and magazine policies were unconstitutional. Although the *Hause* decision is distinguishable from this case, a reasonable person in Clear's position could have concluded from that decision that the Jail Authority's policy prohibiting outside publications complied with the First Amendment. Additionally, the Supreme Court upheld a ban on outside publications under different circumstances in *Beard v. Banks*, 548 U.S. 521 (2006). HRDC has not pointed the court to any controlling case law that would have alerted Clear that the Inmate Communications policy violated publishers' First Amendment rights. Therefore, I will grant Clear's Motion for Summary Judgment as to the First Amendment claim.

On the due process claim, however, I conclude that Clear is not entitled to qualified immunity. In *Montcalm*, 80 F.3d at 106, the Fourth Circuit stated, "We

hold that publishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate subscribers." Yet the policy signed and implemented by Clear only allowed for an unreasonable five-day appeal window. Moreover, while the policy states that notices will be sent when mail is confiscated, it does not expressly require such notice with respect to magazines or packages. At least in the wake of the filing of this suit and the entry of the preliminary injunction, the undisputed evidence demonstrates that Clear knew the policy was not being consistently followed or applied in a way that complied with the requirements of *Montcalm*. I therefore conclude that Clear violated HRDC's clearly established right to notice and an opportunity to be heard regarding the rejection of its mailings, and he is not entitled to qualified immunity on the due process claim.

## *E. Personal Involvement of Clear.*

Clear contends that there is insufficient evidence of his personal involvement to justify holding him liable for violation of HRDC's due process rights. Under § 1983, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Rather, "a plaintiff must

[show] that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.*

> For supervisory prison officials to be held liable under § 1983 for constitutional injuries inflicted by their subordinates, an inmate must establish that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable' risk of constitutional injury; (2) the supervisor's response to this knowledge was so inadequate as to show 'deliberate indifference or tacit authorization' of the offensive practices; and (3) there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered.

*Wilkins v. Upton*, 639 F. App'x. 941, 945 (4th Cir. 2016) (unpublished) (citing *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

As evidence of his personal involvement, HRDC notes that Clear signed policies imposing unreasonable appeal timelines; learned of the January 26, 2017, letter from HRDC and discussed it with his subordinates but did not respond or direct his subordinates to respond; and intended to personally review with Lockhart all of HRDC's mailings after this litigation commenced. While Clear undertook some investigation of the policies and practices at the Jail Authority's facilities, there is no evidence that he took any action to prevent further due process violations prior to the entry of the preliminary injunction.

I find that the undisputed facts demonstrate that Clear was personally involved in the deprivation of HRDC's due process rights. I will therefore deny

his Motion for Summary Judgment as to the due process claim and will grant HRDC's Motion for Summary Judgment as to the due process claim against Clear.

*F. Punitive Damages.*

Finally, in the Defendants' Motion for Summary Judgment, the defendants argue that the evidence is insufficient to support any award of punitive damages. The defendants note that other jails across the country had policies similar to the Jail Authority's policies, so Clear was not on notice that they were doing anything wrong.

HRDC counters that a jury could find Clear liable for punitive damages because he acted with reckless disregard for HRDC's rights, in the face of a perceived risk that his actions would violate HRDC's rights. According to HRDC, Clear's subjective state of mind is at issue, which is a matter for the jury to determine. The defendants note that Clear adopted a revised policy providing a 10-day appeal window after this court expressly held that a 10-day window was unreasonable.

Punitive damages are available in a § 1983 action when the public official's "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). I find that at this stage of the case the plaintiff

has produced evidence sufficient to allow a jury to decide — based on all of the evidence — whether Clear acted with reckless indifference toward HRDC's due process rights. I will therefore deny the Defendants' Motion for Summary Judgment as to punitive damages.

IV.

For the reasons given, it is **ORDERED** as follows:

1. Plaintiff's Motion for Summary Judgment and Permanent Injunction, ECF No. 56, is GRANTED IN PART and DENIED IN PART;

    a. The motion is granted as to the First Claim for Relief against the Southwest Virginia Regional Jail Authority on the issue of liability;

    b. The motion is denied as to the First Claim for Relief against Stephen Clear;

    c. The motion is granted as to the Second Claim for Relief against both defendants on the issue of liability;

2. Defendants' Motion for Summary Judgment, ECF No. 58, is GRANTED IN PART AND DENIED IN PART;

    a. The motion is granted as to the plaintiff's First Claim for Relief against Stephen Clear; and

b.  The motion is otherwise denied.

3.  A jury trial will be held on the issue of damages; and

4.  Following the jury trial, the court will schedule a hearing as to injunctive relief.

ENTER: June 5, 2019

/s/ *James P. Jones*
United States District Judge